NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

BRIANNA R., JORDAN M., *Appellants*,

*v.*

DEPARTMENT OF CHILD SAFETY, P.M., K.M., *Appellees*.

No. 1 CA-JV 19-0401
FILED 9-22-2020

---

Appeal from the Superior Court in Maricopa County
No. JD34832
JS19559
JS19923
The Honorable Karen A. Mullins, Judge

**AFFIRMED**

---

COUNSEL

The Stavris Law Firm, PLLC, Scottsdale
By Alison Stavris
*Counsel for Appellant Brianna R.*

Czop Law Firm, PLLC, Higley
By Steven Czop
*Counsel for Appellant Jordan M.*

Arizona Attorney General's Office, Phoenix
By Doriane F. Neaverth
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Maria Elena Cruz delivered the decision of the Court, in which Presiding Judge James B. Morse Jr. and Judge Paul J. McMurdie joined.

---

**C R U Z**, Judge:

¶1  Brianna R. ("Mother") and Jordan M. ("Father") appeal the superior court's order terminating their parental relationships to their children, K.M. and P.M. For the following reasons, we affirm.

## FACTUAL AND PROCEDURAL HISTORY

¶2  Mother and Father (collectively, "Parents") are the biological parents of K.M., born June 2017, and P.M., born October 2018.

¶3  In the late evening of August 24, 2017, Mother and Father brought K.M., then two months old, to Banner Hospital. Parents told the hospital staff that K.M. had been crying, then suddenly stopped making noise, became limp, and had abnormal breathing. Parents told doctors that other than some reflux issues, K.M. had been an otherwise healthy and happy baby. Parents denied that K.M. had any prior hospitalizations or neurological problems, and they denied he had been involved in any accidental injury, such as a fall or car accident. Doctors told Parents to try feeding K.M., but he projectile vomited after drinking only about an ounce of formula.

¶4  Concerned K.M. had sepsis or another infection, doctors gave K.M. IV fluids and antibiotics. K.M. underwent blood tests, which revealed he had elevated white blood cell, platelet, and lactic acid levels. X-rays also indicated that K.M. had "hyperinflated lungs and peribronchial thickening suggesting bronchiolitis or reactive airway disease." K.M. did not have a fever. Doctors transferred K.M. to Phoenix Children's Hospital ("PCH") early on the following morning for a lumbar puncture and further testing.

¶5  Additional lab work was completed on K.M., which ruled out any blood disorder. The lab work also indicated that K.M.'s platelet and blood cell counts had returned to normal levels. A CT scan and an MRI were conducted on K.M.'s brain, which showed K.M. had a subdural hematoma, as well as subarachnoid and retinal hemorrhages. At this point, doctors became concerned K.M. had possibly been abused, and he was

transferred to an intensive care unit. A nurse practitioner with the child protection team at PCH, Cynthia Nelson, examined K.M. Nelson found that K.M.'s injuries were consistent with abusive head trauma, better known as "shaken baby syndrome," and suspected child physical abuse. Parents told Nelson that K.M. had reflux issues since birth, and he had been spitting up his formula often and was fussy. However, Parents were recently given a prescription for a new formula, and since changing formulas, K.M. was "mostly happy." Parents did not indicate any other concerns regarding K.M.'s health prior to his hospitalization.

¶6 Nelson asked Parents to explain the events that led up to K.M.'s hospitalization. Parents told Nelson that on the day of K.M.'s hospitalization, he had been slightly fussier than usual. Around 8:30 p.m., Father was home alone with K.M. while Mother was driving a friend home. Father explained that K.M. woke up and was crying, so Father took him to the living room to change him. Father said K.M. was still crying, so he placed K.M. on the couch and went into the kitchen to prepare a bottle. While in the kitchen, Father heard K.M. stopped crying. Father went back into the living room, and he stated K.M. looked like he was asleep. However, when Father picked K.M. up, he was limp. Father tried patting K.M's butt, lifting his arm, and pinching his leg, but K.M. did not respond or react. Father called Mother, who told him she was on her way home, between five to ten minutes away. By the time Mother came home, K.M. had started to wake and open his eyes. However, K.M.'s pupils were large, and he seemed pale, "dazed," and was not acting normal. Soon after, Parents drove K.M. to the hospital.

¶7 A pediatric ophthalmologist, Dr. Cassidy, was brought in to consult on K.M.'s retinal hemorrhages. Dr. Cassidy found that K.M. had optical nerve damage and hundreds of hemorrhages in both eyes across all three retinas and in all geographic areas of the eyes, which was consistent with abusive head trauma. Dr. Cassidy also noted his concern that blood was blocking the central view in the left eye, which could affect K.M.'s vision as he grew older. Neurology was also asked to assess and consult on K.M. Dr. Teaford, of Neurology, identified that K.M. was experiencing seizures, and so K.M. was subjected to twenty-four-hour EEG monitoring and was placed on anti-seizure medications. Despite this, doctors identified that K.M. was awake, alert, and did not appear to be in distress.

¶8 A couple of days after K.M. arrived at PCH, the test results for K.M.'s lumbar puncture came back. The lumbar puncture of K.M. tested negative for bacterial infections, although K.M. did test positive for enterovirus, a common viral infection in children that could be

asymptomatic. However, the positive enterovirus test could also be indicative of a more serious illness, such as meningitis or encephalitis. To determine if K.M.'s retinal and subdural hemorrhages were correlated to a possible virus, such as meningitis or encephalitis, PCH requested a pediatric infectious disease specialist, Dr. Nania, to conduct an evaluation. During the lumbar puncture, the needle could have struck a blood vessel, causing blood to mix into the spinal fluid and alter the results. Therefore, Dr. Nania could not say if the positive test for enterovirus was indicative of meningitis or encephalitis. However, K.M. was not presenting as an ill child, he did not have a fever, and his vitals were normal. Dr. Nania opined that the enterovirus did not cause the subdural, subarachnoid, and retinal hemorrhages in K.M., and instead, these injuries were more concerning for trauma.

¶9        PCH notified the Office of Child Welfare ("OCW") and the Department of Child Safety ("DCS") that K.M. had potentially been abused. OCW investigator Brian Moore, as well as law enforcement, conducted a joint investigation. Parents were interviewed and denied causing the injuries to K.M., and neither believed the other parent to be responsible for the injuries. Parents admitted they were the sole caretakers for K.M., and K.M. had never been alone with anyone else without Mother or Father present. Parents told OCW and law enforcement the same version of events that took place on the day of K.M.'s hospitalization that they told nurse Nelson. However, Parents added that K.M. had been "inconsolable" in the days leading up to his hospitalization, he was not sleeping or eating, and he had been projectile vomiting. Mother told Moore that she believed his recent immunizations or genetic issues caused K.M.'s injuries.

¶10        K.M. spent about ten days in the hospital. DCS served Parents with a temporary custody notice, and Parents were unable to take K.M. home. Instead, K.M. was released from the hospital into the custody of the maternal grandmother. Shortly after, DCS filed a dependency petition, alleging Mother and Father were unable to parent K.M. due to physical abuse or failure to protect K.M. from physical abuse.

¶11        Parents were referred for case aide services and parent aide services and offered supervised visitations. DCS recommended that Parents enroll in individual counseling sessions and undergo psychiatric evaluations, as well. Mother and Father were referred for psychological evaluations, which took place in November 2017 with Dr. Thal. Parents denied abusing K.M. during both of their evaluations. However, Dr. Thal opined that Parents should engage in counseling, and any attempts at

reunification should be made with "great caution," given the circumstances of K.M.'s dependency.

¶12 Although Parents were engaged in services, Parents continued to deny any involvement in K.M.'s injuries. Due to Parents' refusal to acknowledge the abuse, DCS sought to terminate the parental relationship in April 2018. DCS alleged that neither parent was capable of protecting K.M. from abuse, Parents lacked insight into the severity of K.M.'s injuries, and Parents were unwilling to accept the judgment of medical professionals, which demonstrated their lack of concern for K.M.'s safety.

¶13 A contested dependency hearing was held over eight days in September 2018 through December 2018. During the hearing, there was testimony from OCW investigator Moore, the DCS case manager, maternal grandmother, Mother's counselor, the parent aide, psychologist Dr. Thal, nurse Nelson, pediatric ophthalmologist Dr. Cassidy, pediatric infectious disease physician Dr. Nania, defense expert Dr. Matshes, and Parents. Following the conclusion of the dependency hearing, the superior court found K.M. dependent as to Mother and Father.

¶14 During the dependency adjudication and in October 2018, Mother gave birth to Parents' second child, P.M. After his birth, P.M. was taken from the hospital and into the temporary physical custody of DCS. Maternal grandmother was unable to serve as placement for two young children, so P.M. was placed with another relative. DCS filed a dependency petition, alleging P.M. was dependent to Mother and Father due to the alleged abuse of K.M., which created an imminent risk of harm to P.M. DCS subsequently moved to terminate Mother and Father's parental relationship to P.M. in February 2019.

¶15 The dependency adjudication as to P.M. and the termination hearing for both P.M. and K.M. were consolidated and held over eight days from May 2019 through September 2019. During the trial, testimony was again heard from Dr. Thal, Dr. Cassidy, maternal grandmother, the former DCS case manager, and Parents. In addition, there was testimony from paternal grandmother, injury biomechanics engineer Dr. Bertocci, defense expert Dr. Loyd, pediatric ophthalmologist Dr. Plotnik, and the current DCS case manager. After the State rested, Mother's attorney made an oral motion for judgment as a matter of law, arguing the State failed to raise any evidence as to the best interests of the children. The superior court denied the motion.

¶16 Following the trial, the superior court found P.M. dependent as to Mother and Father, and the court terminated Parents' parental relationships to K.M. and P.M. Mother and Father timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes ("A.R.S.") sections 8-235, 12-120.21(A)(1), and 12-2101(A)(1).

**DISCUSSION**

¶17 Although the right to custody of one's children is fundamental, it is not absolute. *Michael J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 246, 248, ¶¶ 11-12 (2000). To terminate a parental relationship, the superior court must make a two-part inquiry. *Alma S. v. Dep't of Child Safety*, 245 Ariz. 146, 149-50, ¶ 8 (2018). First, the court must find by clear and convincing evidence at least one of the grounds for termination in A.R.S. § 8-533(B). *Id.* Second, the court must find by a preponderance of the evidence that severance is in the child's best interests. *Id.*

¶18 "The juvenile court, as the trier of fact in a termination proceeding, is in the best position to weigh the evidence, observe the parties, judge the credibility of witnesses, and make appropriate findings." *Jesus M. v. Ariz. Dep't of Econ. Sec.*, 203 Ariz. 278, 280, ¶ 4 (App. 2002). Accordingly, this court does not reweigh the evidence, and will look only to determine if there is reasonable evidence to sustain the court's ruling. *Mary Lou C. v. Ariz. Dep't of Econ. Sec.*, 207 Ariz. 43, 47, ¶ 8 (App. 2004). We accept the court's factual findings if reasonable evidence supports them and will affirm its severance ruling unless it is clearly erroneous. *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3, ¶ 9 (2016).

I.    Statutory Ground of Willful Abuse or Failure to Protect from Willful Abuse

¶19 The superior court terminated Mother and Father's parental rights pursuant to A.R.S. § 8-533(B)(2), finding each "parent has neglected or wilfully abused a child. This abuse includes serious physical or emotional injury or situations in which the parent knew or reasonably should have known that a person was abusing or neglecting a child." Abuse is further defined as

> the infliction or allowing of physical injury, impairment of bodily function or disfigurement or the infliction of or allowing another person to cause serious emotional damage as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior and which emotional damage is diagnosed by a medical doctor or psychologist and is

caused by the acts or omissions of an individual who has the care, custody and control of a child.

A.R.S. § 8-201(2).

A.    Abuse of K.M.

¶20    Mother argues that DCS failed to prove by clear and convincing evidence that Mother abused K.M. or was unable to protect K.M. from abuse, and she argues that the medical findings do not "conclusively demonstrate" that K.M. was abused.  However, as Mother recognizes in her brief, clear and convincing evidence does not require "conclusive" evidence, but instead evidence that is "highly probable or reasonably certain." *See Kent K. v. Bobby M.*, 210 Ariz. 279, 284-85, ¶ 25 (2005) (internal quotation omitted).  On appeal, this court does not reweigh the evidence, and we find there is reasonable and sufficient evidence to sustain the superior court's ruling that either Mother abused K.M. or failed to protect K.M. from abuse. *See Jesus M.*, 203 Ariz. at 280, ¶ 4; *Mary Lou C.*, 207 Ariz. at 47, ¶ 8.

¶21    Ophthalmologist Dr. Cassidy found hundreds of hemorrhages throughout the retinas in both of K.M.'s eyes.  The hemorrhaging was extensive and present in all geographic areas of the eyes, and throughout all three layers of the retina: underneath, within, and in front of the retina.  Dr. Cassidy testified that there are specific ways to distinguish retinal hemorrhages depending on the cause of the injury, and he opined that the particular type and pattern of hemorrhaging found in K.M.'s eyes was consistent with abusive head trauma.  Dr. Cassidy further testified that the particular hemorrhaging in K.M.'s eyes could have only been found in four circumstances: (1) a crushing force to the head; (2) a significant single acceleration/deceleration injury, such as a fall from forty to seventy feet or a high-speed car accident that resulted in impact; (3) a repetitive acceleration/deceleration injury, such as a vigorous shaking; or in very rare cases (4) a rare blood disorder, such as end-stage leukemia or sepsis that has progressed to the point where the child's organs are shutting down.  Parents denied K.M. was involved in an accident, a car crash, or fall, and blood tests ruled out the possibility that K.M. suffered from any blood disorders, leaving the most likely possibility for K.M.'s injuries to be from vigorous shaking.

¶22    When K.M. first arrived at Banner Hospital, K.M.'s white blood cell, platelet, and lactic acid counts were elevated.  Within several hours, however, K.M.'s levels were normal.  Infectious disease physician

Dr. Nania testified that because K.M.'s blood cell and platelet count dropped and normalized so quickly, the elevated levels are likely an indication of physiologic stress or trauma, as opposed to an infection. Although K.M. was given a dose of antibiotics, Dr. Nania testified that it would be unlikely that the antibiotics would have resolved an infection so quickly.

¶23　　　　K.M. tested positive for enterovirus, although Dr. Nania testified that this is a common virus in children that includes over seventy distinct viruses that can be asymptomatic, as mild as a common cold, or it can be a more serious illness like meningitis or encephalitis. Given the tainted lumbar puncture at the time the spinal fluid sample was extracted, Dr. Nania was unable to rule out definitively any viral infections. However, Dr. Nania testified that it was unlikely K.M. would have been suffering from meningitis or encephalitis, because K.M. did not have any symptoms of these illnesses, particularly the universal symptom of a fever. Dr. Nania also testified that given the extent of K.M.'s hemorrhaging and hematomas, his injuries were not consistent with meningitis or encephalitis. Likewise, Dr. Cassidy testified that it is uncommon to see hemorrhaging in cases of meningitis, and in the rare occasions that hemorrhaging is present, it consists of only ten to twenty hemorrhages and is not the same pattern as found in K.M.'s eyes.

¶24　　　　Pathologist Dr. Matshes testified on behalf of Mother and Father as their medical expert. Dr. Matshes did not observe K.M. personally and did not examine him, and he based his opinion on K.M.'s medical records. Dr. Matshes opined that K.M. was not the victim of child abuse, and instead, "it is more likely that he had a relatively uncommon disease (viral meningitis, encephalitis or meningoencephalitis) which presented in a rare way." Dr. Matshes was unable to identify the specific disease he believed K.M. suffered from, he did not identify any specific symptoms that K.M. presented with that would be consistent with such a disease, and he provided no testimony that the type of retinal hemorrhaging found in K.M.'s eyes would be consistent with such a disease. K.M. did not have a fever, and none of the examination notes from the doctors indicate that K.M. was presenting as a seriously ill child. Dr. Nania testified that when he examined K.M., he appeared healthy, and there was no indication that he was suffering from sepsis or a serious infection. Similarly, Dr. Cassidy testified that if K.M. had sepsis, he would have been "deathly ill," although K.M. did not appear ill during Dr. Cassidy's examination.

¶25　　　　Dr. Matshes was also unable to rule out that K.M. suffered from abusive head trauma, and he testified that the pattern of hemorrhages

found in K.M.'s eyes usually indicate abuse has occurred. Dr. Matshes conceded that it would be rare for a child to suffer from the type of retinal hemorrhaging K.M. sustained if he was severely ill, but it would not be rare to see this type of hemorrhaging in a child with abusive head trauma. In his expert report, Dr. Matshes states that "the dominant clinical child abuse pediatrics view is that certain types of retinal hemorrhages are highly suggestive—if not diagnostic—of Abusive Head Trauma." Dr. Matshes stated further that the incidence of retinal hemorrhages in abusive head trauma is about 85 percent, but he "assign[s] no significance to the retinal hemorrhages documented in this case." The superior court found this to have "seriously erode[d]" Dr. Matshes' credibility.

¶26 Parents have attempted to undermine Dr. Cassidy's findings with that of another ophthalmologist, Dr. Plotnik. Although Dr. Cassidy testified that K.M. had permanent nerve damage, and as of a December 2018 examination, there was still some staining or scarring in K.M.'s left macula, Dr. Plotnik did not observe any abnormalities with K.M.'s eyes in April 2019. However, Dr. Plotnik testified that while maternal grandmother told him K.M. had retinal hemorrhages at the age of two months from an unknown cause, he was not told that the hemorrhages were in the hundreds. Dr. Plotnik testified that he was also unaware that K.M. had nerve damage. Dr. Plotnik observed K.M. for only about five minutes, and had he been aware of K.M.'s medical history, he would have altered his examination to look more in-depth for the scarring and nerve damage observed by Dr. Cassidy. Dr. Plotnik testified that he did not question or doubt Dr. Cassidy's previous findings, and his quick examination had not uncovered any issues that were "grossly visible."

¶27 Parents have also attempted to cast doubt that they shook K.M. because PCH records do not indicate that there was any bruising, fractures, or other external injuries on K.M. Biomechanical injury engineer Dr. Loyd testified as Parents' expert witness. Dr. Loyd testified that if Mother and Father had shaken K.M., there necessarily would have been external injuries on K.M., such as bruising, fractured ribs, or a neck injury. However, Dr. Loyd was unable to point to any scientific studies or literature that supported his opinion. Dr. Loyd also testified that if an adult held an infant under his armpits and shook him, the infant's arms would rip off, "no doubt about it." In its ruling, the superior court stated that it was at this point that the court "lost complete confidence in Dr. Loyd's credibility."

¶28 Dr. Bertocci, the State's biomechanical injury engineer, testified that abusive head trauma can occur without evidence of external injuries, which was confirmed by various clinical studies. Dr. Cassidy

corroborated this testimony, and he testified that in his personal experience of treating children, about twenty percent of children with abusive head trauma had no external injuries. Dr. Bertocci also testified, and Dr. Loyd agreed, that an individual can have bruising that is not visible to the human eye, or the bruising may take several days to appear. Dr. Bertocci also testified that imaging techniques, like MRIs, do not necessarily detect neck injuries. There was also evidence at trial that PCH never completed an MRI of K.M.'s neck, so it was unknown if he had suffered from any neck injuries.

¶29        Finally, the superior court found both Mother and Father lacked credibility and concluded that at the trial "Mother and Father exaggerated or outright fabricated material aspects" of the events the day K.M. was hospitalized. At trial, Mother testified that the day K.M. was hospitalized, K.M. was inconsolable and would not calm down. She stated that K.M. would only sleep for fifteen to twenty minutes at a time, and he would wake up with his face beet red, his back arched, and he cried as though he was in pain. Mother also testified that K.M. had been projectile vomiting, and he was not tracking Mother with his eyes. Neither Banner's nor PCH's hospital records memorialize these facts, even though both hospitals took a history from Parents when they arrived. PCH records indicate that Parents told doctors K.M. was previously healthy. Mother told nurse Nelson that since changing K.M.'s formula, he was "mostly happy now." Banner records state that Mother and Father denied vomiting, shortness of breath, fever, and chills.

¶30        Mother testified that K.M. had a two-month well-baby check on August 10, and K.M. was ill at the time. The medical records from this visit reflect that the only concern Parents had for K.M. was that he was spitting up formula, which the doctor diagnosed as reflux. Mother also testified that even though K.M. was ill, the doctor insisted Mother give K.M. his vaccinations. Again, the medical records do not support this testimony. A return visit was recommended in a week, but Parents did not return to the doctor's office before the August 24 hospitalization.

¶31        Mother and Father also testified that prior to his hospitalization, K.M. was croupy and had a fever of about 102 degrees that lasted four days, beginning around August 12. However, Mother and Father did not bring K.M. to the doctor. Instead, Mother alleges that she called her doctor and told them about K.M.'s fever on several occasions, but there is no record of these phone calls. The doctor's office has a record that Mother called to refill K.M.'s formula prescription on August 23, and the record does not indicate that Parents expressed any concern about K.M.'s health. Parents also claim that although their ten-week-old son had a fever

of about 102 degrees for four days in a row, the doctor's office told Mother she was overreacting and "crazy" for her concern, and it was unnecessary to bring K.M. into the doctor's office. Again, there is no record in the doctor's office or hospital records that support this account of events.

¶32　　Although Mother and Father have continued to deny abusing K.M., there is reasonable evidence to suggest Parents were not credible witnesses or historians as to the events that led to K.M.'s hospitalization, and there is compelling medical evidence that K.M. suffered from abusive head trauma. Mother and Father testified that they were the sole caregivers of K.M. and that K.M. was never alone with another person without Mother or Father also present. The superior court did not err in finding that K.M. suffered from abusive head trauma.

### B.　　Risk of Abuse to P.M.

¶33　　P.M. was placed in DCS custody right after his birth, and there are no allegations that Mother or Father abused him. However, the superior court can terminate parental rights to children who exhibit no evidence of abuse if it finds by clear and convincing evidence that there is a risk of harm to those children. *Sandra R. v. Dep't of Child Safety*, 248 Ariz. 224, 228, ¶¶ 16-17 (2020).

¶34　　Mother argues that because there is insufficient evidence to support a finding that K.M. was abused, the superior court's finding that P.M. was at risk of abuse automatically fails. However, as explained above, there is reasonable evidence to support the superior court's finding that K.M. was abused. Mother also contends that P.M. is not at risk of abuse, because she did not abuse K.M., and she was able to "effectively and appropriately" parent P.M. during visitations.

¶35　　The superior court found that P.M. was "vulnerable for the same abuse suffered by [K.M.] given his infant status, and Mother and Father intend to raise [P.M] together in the joint residence, even though neither parent recognizes the danger to [P.M.] and the conditions in the home wherein [K.M.] was injured remain the same." Further, the court found that "Mother and Father's refusal to even seriously consider the compelling medical evidence in this case, and instead steadfastly and blindly stand by one another, is unreasonable and creates a significant and intolerable risk of harm" to K.M. and P.M. The superior court did not err in finding there existed a risk of harm to P.M. due to K.M.'s injuries, and thus the court did not err in terminating the parental relationship to P.M.

II.     Best Interests

¶36      Mother and Father argue the superior court erred in determining that termination was in K.M. and P.M.'s best interests. Termination is in a child's best interests if the child will benefit from severance, or the child will be harmed if the court denies it. *Alma S.*, 245 Ariz. at 150, ¶ 13. Additional factors that support a finding the child would benefit from severance include the availability of an adoption plan, a child's adoptability, and whether an existing placement is meeting the child's needs. *Bennigno R. v. Ariz. Dep't of Econ. Sec.*, 233 Ariz. 345, 350, ¶ 23 (App. 2013); *Maricopa Cnty. Juv. Action No. JS-501904*, 180 Ariz. 348, 352 (App. 1994).

¶37      The superior court noted that termination would be a benefit for the children because "each child would continue to reside in a home that is safe and free from the potential for additional abuse," and "each child would have permanency." The court found it would be detrimental not to terminate the parental rights "as there is no reasonable likelihood that the parents will be able to safely parent either child, and thus the children will linger as wards of the court." Additionally, at trial, there was testimony that the children were adoptable, the children were in kinship placements that provided them loving homes, and the placements were willing to adopt the children.

¶38      Mother argues that it is not in K.M.'s or P.M.'s best interests to terminate her parental relationship because she can effectively and appropriately parent and protect her children. Additionally, Mother argues that she loves her children and is bonded to them. However, the existence of a bond between biological family members, "although a factor to consider, is not dispositive in addressing best interests." *Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 98, ¶ 12 (App. 2016). Regardless of her bond with the children, both DCS and psychologist Dr. Thal opined that it was not in either child's best interests to reunify the family given the nature of K.M.'s injuries and Parents' continued denial of abuse. A DCS caseworker testified that DCS was concerned about the risk to the children, stating that "if no parent has come forward and admitted to the abuse, then there would be a concern that the abuse could happen again." Further, even if Mother was not the abuser, DCS testified that her inability to recognize then that Father abused K.M. prevents her from protecting the children in the future.

¶39      Mother also argues her completion in services demonstrates that it is not in the children's best interests to terminate her parental

relationship. Similarly, Father argues the court erred in failing to consider Father's participation in services when deciding the issue of best interests. The superior court expressly recognized Mother and Father's participation in services; however, it also recognized that "these services have not and cannot alleviate the risk of harm to either child."

¶40        Dr. Thal testified that compliance with services would not resolve the risk of further abuse to the children absent Parents' admission K.M. was abused. Dr. Thal testified that Parents' participation in therapy and individual counseling services was thus-far ineffective because the success of these services is "built on candor" and "a patient being able to address a problem." Dr. Thal also testified about the importance of Parents' admission so services could target issues that may have led to the abuse, such as lack of impulse control or failure to manage anger. Further, Dr. Thal opined that a parent's dishonesty as to the child's abuse leads to a higher risk of reoccurrence, and harboring such a secret could be destructive psychologically, weighing heavily on a person's mental state. The DCS caseworker testified that if a parent is unable to acknowledge the problem that led to dependency, it is very questionable that the parent would make any progress in services. *See Maricopa Cnty. Juv. Action No. JS-501568*, 177 Ariz. 571, 577 (App. 1994) ("Leaving the window of opportunity for remediation open indefinitely is not necessary, nor do we think that it is in the child's or the parent's best interests."). The superior court did not err in finding it was in the children's best interests to terminate the parental relationship.

¶41        Finally, Mother argues that the court erred in denying her motion for judgment as a matter of law during the trial, in which Mother argued the State failed to provide any evidence on best interests. However, as previously explained, the State provided evidence during the trial that the children were adoptable and that the current placements were willing to adopt the children. DCS also testified about the importance of permanency and consistency for the children. The court did not err in denying the motion.

III.    Mother's Older Children

¶42        Father argues that the superior court "cannot find Father unfit to parent" K.M. and P.M., because he was helping Mother parent her three older children. Mother also argues that the superior court erred in terminating her parental rights to K.M. and P.M. when Mother has parented three other children. In addition to K.M. and P.M., Mother has ten-year-old

twin sons with Eric N., and she has an eight-year-old daughter with Charles G.

¶43        Even though Parents' abuse of K.M. is sufficient to establish their current unfitness to parent K.M. and P.M., *see* A.R.S. § 8-533(B)(2), the superior court found that Parents' testimony about Mother's parenting of her three older children lacked credibility. It was unclear how much time Mother and Father truly spent parenting the three older children. In its ruling, the superior court stated Mother had "misled the court by testifying that she was [the daughter's] primary caregiver." Although both Mother and Father allege Mother's daughter has transitioned to living with them full time, the current custody orders indicate that Mother and Charles G. have shared physical custody of their daughter. Maternal grandmother also testified that Eric N. had primary physical custody of Mother's twin sons, and Mother sees her twin sons maybe every other weekend.

¶44        There was also evidence that since the twin sons' birth, Eric N. has been the primary parent with physical custody, and Mother admitted she was "unstable" when the twins were younger. In a prior family law matter in 2014 regarding Mother's twin sons, the superior court found Mother was only seeing her sons one time a month. At that same hearing, maternal grandmother testified that "Mother was not a very good mother for a long time" to her twin sons, although "she had gotten better." Charles G. alleged that Mother was not involved in their daughter's life for the first three-and-a-half years.

¶45        Additionally, DCS made it clear that its concern about Mother's and Father's fitness as parents was specific to their ability to care for an infant. DCS stated if the kids "were older, it'd be a different conversation," but newborns in particular "cannot protect themselves" and "don't know how to call for help if something is happening." Dr. Thal testified that newborns are particularly vulnerable and at risk of abuse. Although Mother still sees her older children, they are no longer vulnerable newborns. And although Mother alleges she has experience with infants and was never found to have abused her three older children, there was ample evidence at trial that Mother did not have significant involvement with her three older children when they were infants. The superior court did not err.

IV.    Second Medical Opinion

¶46        Father argues the superior court erred in terminating Father's rights because DCS denied the request of maternal grandmother to get a

second medical opinion of K.M.'s injuries.  During both the dependency adjudication as to K.M. and the termination adjudication for both children, maternal grandmother testified that DCS would not allow her to take K.M. to an unapproved doctor to get a second opinion or examination of K.M.'s eyes.  The superior court addressed this issue in its ruling, stating "[n]either Mother nor Father ever filed a motion with the court requesting a second medical opinion and any issue that could be raised in this regard has been waived."

¶47        Although Father concedes he has waived this argument, he asks this court to address the issue because it is of "great public importance or an issue capable of repetition yet evading review."  Father asks this court to rule that a parent has an absolute right to get a second medical opinion of a child's injuries as soon as possible after the original diagnosis.  We decline to do so.

¶48        Pursuant to A.R.S. § 8-531(5)(c), when DCS has custody of a child, it has "[t]he responsibility to provide the child with adequate food, clothing, shelter, education and *medical care* . . . subject to the residual parental rights and responsibilities if they have not been terminated by judicial decree." (emphasis added).  Citing no case law, Father contends that included in these "residual parental rights" is the right "to get a second opinion of a child that DCS has removed from her care under suspicions of abuse."  However, "[t]he [S]tate has an interest in the welfare and health of children." *Cochise Cnty. Juv. Action No. 5666-J*, 133 Ariz. 157, 161 (1982).  As such, DCS has a legitimate interest in approving the medical professionals that treat children in its custody, ensuring the treating physicians are licensed professionals in good standing, providing adequate care.  Additionally, maternal grandmother testified that DCS gave her a list of preapproved doctors that could treat K.M.; maternal grandmother was free to seek the medical opinion from that list of doctors.  Indeed, K.M. was examined by other ophthalmologists other than Dr. Cassidy.

¶49        Father also argues parents have "a procedural right to obtain a second opinion for the purposes of litigation."  Generally, a party may not argue on appeal legal issues not raised in the superior court.  *McDowell Mountain Ranch Land Coal. v. Vizcaino*, 190 Ariz. 1, 5 (1997).  As the superior court noted, Parents could have filed a motion with the court to request a second medical opinion, and they failed to do so.  Therefore, we deem this argument waived and do not address it further.

## V.     Foster Care Review Board's Recommendation

**¶50**          Both Mother and Father argue that the court erred in not following the Foster Care Review Board's July 2019 recommendation that the case plan be changed to reunification.   While the Review Board Recommendations and Findings are important to dependency and termination cases, neither DCS nor the court is required to follow them. Father cites a statute that states in relevant part, the "department shall provide the local foster care review board with written notice . . . if the department intends to accept or *not implement the board's recommendations*." A.R.S. § 8-515.03(1) (emphasis added).   We do not reweigh evidence on appeal, and it is not within this court's purview to decide the weight the superior court is to give the Review Board's Recommendations and Findings.  *See Jesus M.*, 203 Ariz. at 280, ¶ 4; *Mary Lou C.*, 207 Ariz. at 47, ¶ 8.

**¶51**          Additionally, there was testimony at trial that called into question the extent of the knowledge the Review Board had regarding this case.  DCS testified the Review Board's Recommendations and Findings contained only a basic outline of the facts and K.M.'s injuries, which did not accurately capture the complexity of this case.  While the Recommendation and Findings indicate the Review Board had access to and reviewed various minute entries from the superior court, it does not appear the Review Board had reviewed the superior court's dependency ruling or other, more detailed court orders.  There was testimony at trial that the Review Board told Parents it needed more documentation from Parents because it did not have enough documents and records to complete its review.  DCS was not present at the July 2019 meeting with the Review Board, and there was testimony that the Recommendations and Findings were based almost entirely on Parents' and the grandparents' self-reports.  The superior court did not err.

## VI.     Dependency of P.M.

**¶52**          Finally, Mother argues that the superior court erred in finding P.M. dependent as to Mother.  However, the order terminating Mother's parental rights to P.M. renders the dependency finding moot.  *See Rita J. v. Ariz. Dep't of Econ. Sec.*, 196 Ariz. 512, 515, ¶ 10 (App. 2000) (stating that even if an order entered after a permanency planning hearing was appealable, the appeal would essentially be rendered moot due to a later order terminating parental rights); *see also Cardoso v. Soldo*, 230 Ariz. 614, 617, ¶ 5 (App. 2012) ("[W]e will dismiss an appeal as moot when our action as a reviewing court will have no effect on the parties.").  Accordingly, this

court rejects Mother's challenges to the dependency order, and as stated above, finds termination was appropriate under A.R.S. § 8-533(B)(2).

**CONCLUSION**

¶53      For the foregoing reasons, we affirm.



AMY M. WOOD • Clerk of the Court
FILED:   AA